Good afternoon, Michelle Spirtos. I'm going to be representing myself. I'm going to leave about five minutes for Mr. Eardley to provide a rebuttal. And for the record, your name is? Michelle Spirtos. First, I want to start off and just make a fact very clear because of past decisions that have come out from the Ninth Circuit. I know you guys have read the briefs. I want to make it very clear that this estate of my mother's is not an insolvent estate. The plan provided, it was confirmed in 1996, provided that all claims would be paid. They were paid. There was one claim that would not be paid until the last final appealable order that came from this court, actually. It was called the Moreno claim. And that claim would be paid its full amount of its pro rata share of Class III from the plan, and it would not receive any post-petition interest. That was a salient issue of the plan. The plan was very specific that that claim would not receive post-petition interest, and that's both in the amended disclosure statement and in the plan. Now, Mr. Nielsen, Trustee Nielsen, inherited this case, I think, from two previous trustees. When he inherited the case, he inherited about $380,000. That was distributed to my mother's estate from the estate of Basil Spiritos, who is my father, deceased. That distribution was made in 2001. And also in 2002, there was another distribution made from my father's probate estate to Basil Spiritos' bankruptcy estate. Mr. Nielsen came into the scene in 2003. His previous or his partner at the time, Trustee Elrin, was actually going to dismiss the case and agree to. We had dismissed an appeal that was pending regarding the propriety of dismissing of converting my mother's case in exchange, and rather than the case getting dismissed, Trustee Nielsen came in and started this barrage of litigation. Coincidentally, three days after a RICO suit was filed against him. Now, the next one. There was a RICO suit that was filed against Trustee Nielsen. RICO. And I think it's. Your suit. You said it was filed. You filed it. Not me. It was filed on behalf of my mother and my grandmother. I see. So I was, you know, it was Mr. Elrin was the attorney record. Three days after that, Mr. Nielsen comes in with this barrage of litigation that was, I believe, is clearly retaliatory. Now. Can we get down to brass tacks? Sure, sure. Let's just say we've got a summary, we've got a default judgment entered here. Yes. And your argument is that it's an excessive sanction given the behavior. Well, I don't want to spend too much time on the default judgment. I'll tell you why. Because the district court, when affirming the bankruptcy court, certainly made the wrong standard of law. First of all, default judgment, you know, I don't want to, I believe he abuses discretion. But the bottom line is that default judgment cannot be entered if the complaint fails as a matter of law. A default judgment does not establish facts that are judicially noticeable or inclusions of law. And, in fact, I provided this Court with a 28J letter. I think you received it just this Monday. And the BAP just came out with a decision late 2007. It's called All Points Capital Court v. Meyer. And it goes through the black letter law as a default judgment. It's talking about how just because a default's entered, that doesn't mean a judge should enter judgment in favor of the non-defaulting party. In fact, maybe the bankruptcy court should enter judgment in favor of the defendant if the law requires. So getting down to the bottom line, let's just say that he didn't abuse his discretion. I believe he did with my grandmother. She actually died as a result of Trustee Niels' actions. And then, you know, as Mr. Ridley will talk about, the trustee turned around and said, well, she's not dispensable anyways. I was pregnant. I had a very difficult pregnancy. All I wanted to do was delay my videotaped deposition because it would not comply with any other type of deposition other than a videotaped deposition. If you're a woman and you've gained 80 pounds in pregnancy, it's the last thing you want to do. That was not sufficient for them. And as a result, Judge Ahart somehow lumped me in together of all the previous activities of my mother, my grandmother, because apparently, you know, a $50,000 judgment was entered previously against them for violating the automatic stay, which actually was retroactively lifted, another issue. But I was never sanctioned by Judge Ahart. He had never – I think he had entered one order to compel my deposition. I asked to reschedule that. Mr. Master never replied. Then I filed a writ of mandate to the Ninth Circuit asking for a protective order. The Ninth Circuit then, after about seven weeks, denied that. The day after, he went and got a default, you know, entered against me. But when we got to the hearing about the default judgment, bottom line is that his claim fails. His complaint fails. First of all, Judge Ahart clearly erred because every cause of action under avoidance and Mr. Mastin only pleaded 544. 544 applies to pre-petition transfers. This case was commenced in 1984. Okay. 544A, just like 544B, is subject to the two-year statute of limitations of 546. And actually, the Ninth Circuit decision of In re Software Center International, that's the Ninth Circuit in 1993, determines that when you have a child – And the judge said that the estate is the legal title holder because of the judgment and that while there may or may not have been the requirements fulfilled for adverse possession, there was no entry of title. There was no entry of title. Oh, in favor of my grandmother. Correct. Okay. But this is the issue, though. California doesn't require that. California law doesn't require paper title. It's very clear. California law only requires that after an occupant satisfies the requisites for adverse possession, which is continuous occupancy, five-year period, California follows the minority rule, which is you can either be actually hostile to the owner or occupy under color of title, meaning that you mistakenly believe the property is yours. And after five years, if you pay the property taxes, title vests by operation of law. So my grandmother didn't have to go get a 1998 check. Does California law for adverse possession require that the property be possessed by the adverse possessor adversely and without permission? That's what I'm saying. It can either be possessed either under the color of title, meaning that you mistakenly believe you are the owner, or you actually have adversity against the entity. And my grandmother had adversity because the estate of Thelma Smiertos is who held title, paper title, from 1984 on. And does consent defeat adverse possession? No. Consent, as long as you are occupying the property in California law and giving clear notice to the true owner that you are declaring the property as your own, you satisfy the hostility. My question is different. What if the true owner says, I consent for you to live there? Well, again, if they can give you the consent to live there and you don't believe or are not exerting an ownership interest or asserting an ownership interest, saying this property is mine, then, yes, you may not have adversity. But California law, as with my grandmother, she always believed the property was hers. It was actually her house that was moved onto the property. Paper title was in my mother's name because it was put that way in 1968 prior to my mother filing for bankruptcy because she was a Greek immigrant. There was never a question that that property wasn't my grandmother's. And the adverse possession litigation, that was itself a default judgment, correct? Yes. Yes. But we never had any prove-up of any of the evidence. No, no, no. Not true. Not true. Under California law, a default prove-up is much different for adverse possession. I briefed that very extensively. The State court cannot enter a default judgment unless the applicant proves that they have established and satisfied every element of adverse possession. She had to go in and show she paid the taxes. She had to go in and show that she was the one that had exclusive possession for five years. She argued that she had been living in the property since 1968 because she had. But all she had to do was establish that five years prior to 1998, she was in that property. Mr. Mastin is not going to come up here and tell you that he paid the property taxes or that my mother's estate paid the property taxes because they never did. And, in fact, I've asked for judicial notice, and I've sent it to this court for I need some water, for the property taxes. And the tax assessor has been able to pull up 2000 to 2004. They're pulling up 2004 to 2008. The farthest they can go back to is 1996. But they only need to go back five years. And he's not going to come up here and tell you the estate of Thelma Espirito has paid the property taxes. It never has. So that, you know, harping on the issue of default judgment in state court is really a red herring because my mother didn't have to show up. If she had showed up, what's she going to say? She didn't pay the property taxes. She's never had actual possession of the property. So it doesn't matter. And that's very clear. In fact, I think I cited a practice guide in my opening brief that talks about the versus the normal proof of default judgment. Continue on? Oh, okay. So, you know, that was one issue. I mean, Judge Ahart, again, should have dismissed. I filed a motion to dismiss several times just based on the statute of limitations. Judge Drury came out with a decision just a few months ago from the Ninth Circuit BAP and confirmed that 544 only applies to preposition transfers and that in order to have recovery for the benefit of the state, you actually have to plead a cause of action under 11 U.S.C. 550, either at the same time of the complaint or no later than one year after. If you look at their complaint, they never pleaded a cause of action under 550 for recovery of the benefit of the state. Now it's been five years, so it's clearly barred. It's certainly not stayed during appeal. And, you know, Judge Drury also makes it very clear that, you know, that if you want to attack a post-petition transfer, the trustee has really, if anything at all, 549 at his disposal. But by the time the trustee came into the situation, you had already had a plan that was confirmed in 1996. He sued me in July 2003. Now, another issue in my 28-day letter I think is very interesting is that the First Circuit came out with a decision. It's called Gregory-Skorich. And it actually determined that pretty much a similar issue, that equitable interest in marital property and interest in real property in general are not claims as defined under 101. It says that a claim actually has to be either a right to payment or an equitable remedy for breach of performance. Now, the plan, when it was confirmed, was very specific. The stay would be automatically lifted upon confirmation, and it would only continue as to pre-petition claims and only for collection or enforcement of claims. My grandmother's 1998 quiet title action was not a claim as defined by the bankruptcy code, 101. So, you know, again, and even if it were, even if it were, and Judge Ahart was correct that the quiet title action was violative of the automatic stay. Again, how do you explain the post-confirmation activity from 1996 to 2003? That's almost seven years. My grandmother deeded the property to me in 2001. I'm entitled to tacking under California law, and we paid the property taxes. We actually possessed the property, hostile and adverse to the bankruptcy estate and under color of title. So, you know, by the time Judge Ahart had entered judgment against me, regardless of his theory about the violation of the stay, title had already revested by operation of law. So, you know, I think that's a very important issue to make. I also want to make one more point. This whole issue of this property vesting upon a conversion under this consolidated pioneer analysis, and I want to emphasize that the consolidated pioneer case is quite different. In consolidated pioneer, the plan actually preserved that property in trust for creditors to be paid. If you look at my mother's plan, it's very specific. This property was not supposed to remain for any time beyond two years. And after two years, Moreno had 30 days after the two-year period to either request that it be refinanced or she sell it. And that was only if her claim was impaired. There's a reason why Moreno didn't request or exercise that option, because her claim was never impaired. And as we established during the 2004 default proof of hearing, all these claims were paid. In fact, I had to show Judge Ahart, I had to go through the checks and say, these are the records of the office of the U.S. trustee. In fact, Judge Ahart, you even entered an order in April 1997 disallowing every other claim but the Moreno claim because they had already been paid or disallowed for other reasons. I mean, one of the problems is that there's an offset between Basil's estate and Thelma's estate, and basically you have a trustee who's so eager to file a lawsuit against us because of he's retaliating clearly for the RICO suit, and he didn't spend time looking at the docket. That's our problem. And actually in his complaint, he complains that we didn't give him the proper information for him to figure out that there's an order in the docket, and he couldn't read the plan and figure that out, and he actually didn't have access to the records from the office of the U.S. trustee. I mean, that's absurd. And after I went through that piece by piece with Judge Ahart, that is why he did not We had stipulated that we would let, because the problem with the plan was that in one portion of the plan, it provided that she would be infusing a certain amount. Then somewhere else in the plan, it gave a different amount. And I admitted I didn't draft the plan. Actually, Robinson, Diamond, Brown, and Posner drafted it, and it was certainly not the model of clarity. And so to make things easier, we had stipulated that my mother would just infuse another $66,000 to make the numbers even. But, Judge Ahart. Kagan, you're down to about a minute and a quarter. Oh, I'm sorry. Do you want to save the time for rebuttal? We'll hear from the other side.  I'll give you a chance to respond. Yes. Okay. Good afternoon. It may please the Court. Peter Mastin of Gunport-Reichman, appearing on behalf of R. Todd Nielsen, Chapter 7 Trustee of the Bankruptcy State at Thelma Sturtos. There are two overarching issues involved in this case. The first is whether the bankruptcy court properly exercised its discretion in striking the spirit test's answer and entering the default as a result of discovery abuses. That was based on a motion brought by the trustee to which the spirit test submitted no evidence in opposition. The second issue is the bankruptcy court's proper entry of the default judgment. This was a default judgment motion. The spirit test has had no standing to introduce any evidence except as to the issue of damages. And on the one damages issues, the parties did stipulate to the Dollar Act. Judge Ahart directed the trustee to introduce evidence of a prima facie case. That is what the trustee's obligation was below. That was when you applied for the entry of the judgment. Correct, Your Honor. As I understand, there's a two-step process here. Yes. You've got the discovery sanctions and entry of a default or striking of their answer, entry of a default. First issue, correct. Right. Then Judge Ahart said, okay, come back with me and prove up your claim. Put on a prima facie case. All the trustee had to do was put on some evidence to establish his claims at that point. Now, did the notice of appeal encompass that latter issue? I believe it's an appeal from the judgment, so I think it includes both of those issues. Both? Yes. The trustee did exactly what Judge Ahart did. He put on evidence to prove up his case. And the only proper issue here before this Court is, was that correct? Did the trustee put on that minimal amount of evidence to satisfy a prima facie case? In considering this appeal, there are a number of factual assertions made by the spiritus in their briefs, made here from this podium, for which there's no citation of the record and for which the citations of the record are not correct. Spiritus has also asked this Court to consider in their excerpts of record documents that were not part of the bankruptcy court's adversary proceeding file and are not properly before this Court. And they've also asked you to consider in a recently filed and pressed for judicial notice information that is, A, not part of the bankruptcy court's file, B, things that didn't happen until after the judgment was entered, and C, things that are simply not judicially noticeable, including the truth of the matter of a blog on the Internet. The Court should not fall for this attempt to restate the facts that were before judgment. So entering a default, striking an answer for discovery sanctions, failure to comply with discovery orders, entering a default, it's like the extreme sanction. That's correct. It's usually built up to that. There was a buildup here, and Judge Ahart's entry of that order was proper. This Court in Lujan v. Hughes Aircraft identified four required factors for a court to consider prior to entering default. The only part of this that really gives me any pause, serious pause, is with the grandmother. I forget what her name is. Olympia Villas. She was quite elderly and quite ill. She was elderly. She was ill. And even you guys acknowledged that she was quite elderly and quite ill. That's correct. You didn't propose to take her deposition with a doctor present. What you need to do is look at Judge Ahart's entry. What he said was, we wanted to take her deposition in the hospital. Judge Ahart said, no, I'm not going to let you do that. What I'm going to order them to do is tell you what hospital she's in. I order them to tell you when she gets out. And then within two weeks after that, we're going to take her deposition. But what should the grandmother not do? She did not appear for her initial deposition. She did not, I'm sorry? She was in pretty bad shape, though, right? I don't know what her condition was when she was originally noticed. She was 92. She was in her 90s, yes. That's pretty old. It's elderly. But it's important then, for that reason in addition, to get her testimony. Because as we now know, since this has all happened, Ms. Villas has passed away. And because they refused to produce her in response to deposition notices and court-ordered depositions, we have permanently been deprived of that potential testimony. I want to go back to your question of, well, isn't this really harsh for Ms. Villas? And the answer is, look at Judge Ahart's order. Look at what he did to accommodate Ms. Villas. What he said is, I'm not going to let you take her deposition for more than one hour at a time. Until you're done, one hour at a time a day. And you're going to do it at her house. So he gave her the most comfortable place. He extremely limited the trustee's time that he could spend taking this deposition. He went out of his way to accommodate Ms. Villas. And it's not so much, you know, it is so much that she didn't appear for her deposition, but it's also the pattern and practice of discovery abuses that we established below that led Judge Ahart to the conclusion and the proper conclusion that this is a willful failure to appear. It's also, and part of that pattern and practice was the fact that Villas never told, contrary to Judge Ahart's order, Ms. Villas never told the trustee what hospital she was in. Contrary to Judge Ahart's order, she never told the trustee when she was released from the hospital.  The repeated failure to appear for the depositions is willful. And that finding is not clearly erroneous. We, again, we established a pattern and practice of discovery abuses. They failed to appear for Rule 2004 examinations, court-ordered examinations. They refused to participate in the early meeting of counsel. The other part of our case law is that before they enter, before the court enters an extreme sanction like this, the court's supposed to consider lesser sanctions. That's correct. And Judge Ahart did that. What were the lesser sanctions that he considered with respect to the grandmother? He considered further court orders. He considered monetary sanctions. And he considered, you know, whether determining issues against these defendants would be effective. And with respect to each of those, he concluded they were not. And you can find that discretion at about SCR 14, pages 1669 through 70. As to the lesser sanctions, court orders in this case would not be effective. The trustee demonstrated through evidence that the spirit test has had a history of disobeying court orders. Again, the Federal Rule of Bankruptcy Procedure, court-ordered examinations. Now, which one are you talking about? Are you talking about the grandmother? Are you talking about the mother? Are you talking about? On the 2004s, it had to do with Thelma Spiritus and Polymne Buis. Other deposition, other orders failed to comply with were the order to peer for their court-ordered depositions based on the trustee's motions to compel. They didn't do that. Mrs. Buis also failed to, contrary to Judge Ahart's order, again, tell the trustee what hospital she's in. Again, tell the trustee when she had been released from the hospital. So Judge Ahart looked at this. He considered further court orders, and the evidence showed that these were not going to be successful. He also considered monetary sanctions. In this case, Thelma Spiritus, Polymne Buis, and their counsel, John Irby, had been held in civil contempt, and monetary sanctions had been imposed. Those monetary sanctions were not paid, and to this day remain unpaid. What's more, after the time that Judge Ahart entered those monetary sanctions, the same people engaged in the same conduct for which they were sanctioned and held in civil contempt on two subsequent occasions, and that evidence was before Judge Ahart. That's subsequent conduct, right? No, it is not. It wasn't? That took place prior to the striking of the answer. Oh. That evidence was before the court, that that had actually happened, that the sanctions were imposed, and that they engaged in subsequent conduct subsequent to those monetary sanctions, but all of which was predated the striking of the answer, and it was before Judge Ahart. By the way, what's the status of the bankruptcy estate now? Where's everything? We're in the same status that we have been, Your Honor. As far as financially, the state holds the $385,000, maybe $390,000 worth of interest that it had, and the state does not have the sufficient funds to pay the Moreno claim. Now, on the other hand you're going to have the house. What's that? You have the house now, the house on Parcel 2. I hope so. That's the issue before you. Right. And one problem we have here is. If we affirm the district court's order. If you affirm. We do. The state gets the property. That's correct. And from that, the property would be liquidated. The cash would come into the estate. Creditors would be paid. Trustees would in a professional file fee applications. Get those paid to the extent they're allowed by Judge Ahart. And what's important also to recognize here is there's a residual interest holder here, and that means any proceeds above and beyond what is needed to pay the estate's obligations do go back to Thelma Speartoffs. And that's an important thing to look at here because they say, well, Moreno doesn't have. There's enough money here to pay the Moreno claim. First of all, on the record before the court, that's not true. I've told you how much money is in the estate. But if you look at the plan of reorganization filed by Thelma Speartoffs, she says the Moreno claim is $414,000. That's less than the state has. That's more or less. That is less than. I'm sorry. That is more than the estate has. I'm sorry. And, in fact, there is an order that says the Moreno claim is about $460,000. It probably has interest accumulated by now. I do think there's interest accumulating. Now, they have mentioned in their briefs, and I'm sure they're going to tell you again, that Moreno waived interest as part of the plan of reorganization. But that was assuming they were going to get paid under the plan of reorganization. That never happened. As a result of Thelma Speartoffs' failure to perform that plan, the case had to be converted to Chapter 7. Now, instead of being paid under the plan, Moreno will be paid under 726 of the Bankruptcy Code. And 726 provides for the payment of interest on claims if there's sufficient funds available. Now, even assuming the $414,000 figure, suffice to say, it goes up from there. But even if it were the case that Moreno had, that there was sufficient funds to pay Moreno, Moreno wasn't available for interest or anything like that, even if that was the case, that still doesn't change anything. Because under 704 of the Bankruptcy Code, the trustee has an obligation to collect the property of the estate for which he serves. The trustee in this case filed a lawsuit to determine that the 16-024 property is property of this bankruptcy estate. Now, I mentioned a moment ago that Thelma Speartoffs was a residual interest holder. Had the trustee not obtained that determination and recovered that property, which is property of the estate, but instead left it in the hands of a third party, Thelma Speartoffs could come back to the trustee and say, you didn't discharge your duties, trustee, in getting that property back. Because it was property of the estate, and you should be handing it to me. So regardless of whether there's a Moreno claim, and I want to be very clear on this, there is a Moreno claim. This trustee still has the obligation to do this. I've given you some numbers for the Moreno claim. They're going to tell you probably about all kinds of credits and everything that should be applied to the Moreno claim. Okay. Going back to... Well, I've generally addressed the insolvency issues. They've raised in their opening argument something about money coming in from a probate estate into the Basil Speartoffs estate. I want to be clear. I represent the trustee of the Thelma Speartoffs estate. Thelma is nothing more than a creditor of the... The Thelma estate is nothing more than a creditor of the Basil Speartoffs estate. That is controlled and operated by somebody completely different, and we have no control over that. They've told you that we have a statute of limitations problem in this case. We don't. This case, and each of the causes of action for which Judge Ahart entered judgment, was based on fundamentally or for quiet title or declaratory relief for violations of the automatic stay. And now, again, I'm talking specifically about the claims related to the 1602-4 property because they don't raise that argument as to the money judgment in the 1602-0 property. There is... This Court has made clear that violations of the automatic stay are void, not voidable. The Schwartz case, I believe it is, specifically provides that... At one point, the debtor files bankruptcy. During the pendency of the bankruptcy case, the IRS makes an assessment. Years later, the case is dismissed. Even later, a case is refiled by that same debtor. And what that court... What this court did in that case is it says, if they are void, then the IRS assessment is of no matter here. If they are merely voidable, then it does matter because they took no steps to do... You're over if you want to wrap up in a sentence or two. I will. I want to be clear about the procedural posture of this case. This Court set forth several factors in Lujan v. Hughes Aircraft that had to be considered by Judge Ahart prior to striking an answer and entering the default. Judge Ahart considered all of them. He had evidence for all of them. No evidence was submitted in opposition. And going back to Judge Pius, he made... He went out of his way to make accommodations for Ms. Vilas. Okay. Thank you, Your Honor. Thank you. Good afternoon, gentlemen. I'm John Erkley. First of all, to me, the thing that is the most overwhelming issue in this case, and it hasn't been mentioned by either lawyer, is that Pellemnia Vuis died 10 days before the entry of the default, and she was dead before the entry of the default judgment. And under Ninth Circuit law, it's unquestionable that you cannot have a judgment. They should have substituted in a personal representative. The law is very clear that... And where is that in your brief? Excuse me? Where is that in your brief? That is on page 70, I believe it's 28, is where it begins. King v. Russell is one of the cases, Broussard v. Columbia Gulf. Oh, that's your indispensable party argument. Correct. Your argument depends upon her being an indispensable party. Correct. Well, they have stated here in front of you today and in their paperwork that she was an indispensable party. They claim that was the reason that they needed to have the onerous discovery that they were propounding at that time, a videotaped deposition coming into her home the last days of her life. Now, Rule 19 has got some technicalities to it. Indispensable is a tricky word. You may very much want and very much need testimony from various witnesses. You may need somebody in the case as a party and so on. That does not necessarily mean indispensable party within the meaning of Rule 19. Well, it means indispensable with respect to real property cases. It's very clear. No, I know. As soon as you point me to that's the indispensable party argument, I understand. I know that argument. What you really meant to say was that they didn't have the real party in interest once she died. Correct. Under Rule 25, they required a motion for substitution. Exactly. I agree. But the two interplay. And, I mean, they never made any effort whatsoever to establish a probate estate, which they're required to do. And under 366.2 of the Code of Civil Procedure, within a period of time of a year, they never made a claim. They never filed a probate estate. Did you ever go back to the district court and ask the bankruptcy court to vacate? Yes, we did. In fact, in our motion. Vacate the judgment on the basis that she had passed away? Yes, we did. In fact, in our motion, there was a default that was entered. And then we requested part of this appeal was the fact that the default was not set aside. It should have been. Because, number one, regardless of what Mr. Mastin says. Well, you wouldn't set it aside. You just have to have the estate substituted in. The estate would have to be substituted in. And the estate would then have to be given. Here's what happens. If an indispensable party dies, as the case law clearly indicates in the brief, then what happens is there is really no jurisdiction for the court to enter a judgment. The court cannot enter a judgment against any of the defendants in the case. If one of the indispensable defendants dies, you need to have that personal representative. And, for instance, the case of Hawkins v. Eads, where, again, we're talking about Rule 25 and the indispensable necessity for a person to be substituted in. We're also talking about 366.2, where the trustee had no more than one year to commence an action against the decedent's personal representative. That was never done. So we have not only a default after the death of whom they claimed was an indispensable party. We have not only a default, but we have a default judgment. I guess they want her in there because they need a quiet title. They need to make sure their title is complete. I understand that. But the case law, as we've represented, clearly shows that if the absent party is indispensable, as is the case herein, the action must be dismissed against all other defendants in the case. King v. Russell. That's a Ninth Circuit case. Okay. You're about two and a half minutes over. Well, can I just have one more second? Just a couple things here. Well, listen. I'll give you one more minute, but I'm going to be strict. One more minute, period. All right. That's fine. He talks about these sanctions and so forth that were issued. This case is so unbelievable. I mean, I'm supposed to be submitting a woman who's 95 years old to this kind of discovery against her doctor's orders. That's part of the record. The judge substituted his decision-making for what the doctor thought was right, number one. Number two, just in January of this year, 2008, the clerk issued the discharge, finally, that was not pro tonic, that goes back to 2001. So there never was a violation of any stay under 362. There never was cause for them to bring their lawsuit. Their lawsuit was entirely retaliatory for the lawsuit that was brought against them. And the sanctions that were issued are inappropriate because the stay of 362 never really existed. This Court should take a really good look at this case. There's your minute. Thank you. Thank you. The case of Pearsons v. Nielsen is now submitted for decision and we're in adjournment for the day.
judges: Fletcher, Paez, Duffy